**EXHIBIT** 1



PEPSI-COLA BOTTLING
COMPANY of N.Y., INC.
46-00 FIFTH STREET
LONG ISLAND CITY, N.Y. 11101 TEL. (718) 392-1000

Effective as of the 2nd day of February, 1999, the following attached documents shall constitute the Distributor Agreement between Pepsi-Cola Bottling Company of New York, Inc.("Company") and Joseph V. Eliseo, an individual, Brook Beverage Inc., a New York corporation ("Distributor").

1.  Pepsi-Cola Bottling Group, New York City Operations form of Distributor Agreement (Exhibit A hereto) as amended by an Agreement entered into on July 28, 1984 between New York Pepsi-Cola Distributor Association, Inc. and New York Beverage Acquisition Corporation (now Pepsi-Cola Bottling Company of New York, Inc.).

2.  Agreement entered into on July 28, 1984 between New York Pepsi-Cola Distributor Association, Inc. and New York Beverage Acquisition Corporation (now Pepsi-Cola Bottling Company of New York, Inc.) (Exhibit B hereto). Exhibit A thereto is also Exhibit A hereto.

3.  Agreement and Addendum entered into on May 5, 1989 between New York Pepsi-Cola Distributors Association, Inc. and Pepsi-Cola Bottling Company of New York, Inc. (Exhibit C hereto)

DATED:      New York, New York
            February 2, 1999


                    Company:  Pepsi-Cola Bottling
                              Company of New York, Inc.

                    By: _____ N.P.

                    Brook Beverage Inc.

                    By: _____
                        Joseph V. Eliseo, President

                        _____
                        Joseph V. Eliseo, Individual


PEPSIAGT/C/cf

PEPSI-COLA BOTTLING GROUP

NEW YORK CITY OPERATIONS

DISTRIBUTOR AGREEMENT

AGREEMENT, made the date hereinbelow specified between Pepsi-Cola Bottling Group (hereinafter called the "Company"), a/k/a Pepsi-Cola Metropolitan Bottling Company, Inc., a New Jersey corporation, or its successors, with offices at 700 Anderson Hill Road, Purchase, New York 10577, and              , an individual, and              , a New York corporation (hereinafter called the "Distributor"), of the address specified below.

The Company is engaged in the business of bottling and canning the carbonated beverages known as and sold under the trademarks Pepsi-Cola, Pepsi, Pepsi Light, Patio, Teem, Mountain Dew, Schweppes and NuGrape Grape Soda, including the dietetic soft drinks sold as Diet Pepsi-Cola or Diet Pepsi (all said soft drinks being hereinafter collectively referred to as the "Beverages"), and processing beverage concentrate into Beverage Syrup, and also in the business of distributing the Beverages and Beverage Syrup, all in accordance with the provisions and limitations of the respective Bottling and Syrup Appointments, through employees and Distributors in and about New York City.

In order to promote a more orderly and efficient distribution of the Beverages and Beverage Syrup in the area above specified and to increase sales, the Company has established restricted territories in which its sales of the Beverages intended for consumption within each restricted territory, with certain exceptions, are sold and distributed to outlets in the territory only by the Company through its employees or the Distributor designated for the territory.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Company and the Distributor hereby covenant and agree as follows:

1.    APPOINTMENT-TERRITORY-EXCLUSIONS

Subject to the provisions of this agreement, the Distributor shall act as exclusive agent for delivery of the Beverages and Beverage Syrup to outlets in the territory specified in the attached Schedule (hereinafter referred to as the "Territory"). The following classes of sales and distribution of the Beverages are excluded from coverage under this agreement: (a) sales of private label brands or other beverages not included in this agreement, to stores of any chain store organizations with which the Company shall from time to time have warehouse delivery agreements; (b) sales in the Distributor's Territory intended for distribution or

the Distributor's Territory intended for distribution or resale outside thereof; (c) sales to special accounts, which for reasons that the Company may deem sufficient, are to be directly serviced by the Company provided, however, that the Distributor shall have the right of first refusal to service the same special account in accordance with the required terms; (d) sales or distribution intended for retail sale through cup vending machines, it being specifically understood that the Distributor shall have the right to act as distributor for the delivery of Beverages intended for sale through bottle or can vending machines, except that the Company reserves the right to sell and distribute to industrial and other accounts where bottle or can vending machines are located which may require full service, special service, or the type of service which the Distributor cannot give to such accounts and which the Company may desire to give; and (e) sales and distribution of Beverage Syrup which are reserved to PepsiCo, Inc., under the terms of the Company's Syrup Appointment from PepsiCo, Inc.

2.    SALES OF COMPETITIVE BEVERAGES

The Distributor shall not bottle, sell or distribute directly or indirectly, in the Distributor's Territory any beverage known or sold as a cola beverage or in the name of which "cola" or "kola" occurs or any beverage which could be confused with Pepsi-Cola, or any other soft drink having the flavor of any of the Beverages, nor will the Distributor distribute or sell in any capacity whatsoever, directly or indirectly, any other soft drink with a name the same as any such soft drink or with a name or trademark which could be confused with the name of any such soft drink.

3.    OUTLET COVERAGE - NEW ACCOUNTS

(a) The Distributor shall secure full distribution of the Beverages in the Territory and to that end shall individually (or by his or its own employees directly supervised by the Distributor) at all times diligently promote the sale and distribution of the Beverages in the Territory, and shall actively solicit the sale of the Beverages to every appropriate outlet therein.  All outlets are to be serviced at least once a week unless the outlet requests less frequent service and such request is verified by the Company, and the Distributor's service of accounts and operation of delivery trucks are to be in effect at least five days a week except that such service shall not be required on a holiday observed by the Company provided all accounts are serviced during such week (in other words, the sole intent of this sentence is to require a minimum of a once a week service per outlet regardless of whether or not the week includes a holiday). The Company waives strict performance by any Distributor with respect to service on those religious holidays not observed generally by the Company, especially Rosh Hashonah, provided

that all accounts are serviced during the weeks in which such holidays fall and provided that the Distributor is aware of and will reasonably cooperate with the Company in the resolution of the problems created for the Company by the operation of the Company's bottling plants on those holidays and the lack of adequate storage facilities in those plants. Distributor will push vigorously the sale of the Beverages and Beverage Syrup throughout the entire Territory in any size or type bottle prescribed by the Company.  Without in any way limiting the Distributor's obligation under this Paragraph 3, the Distributor must fully meet and increase the demand for the Beverages throughout the Territory and secure full distribution up to the maximum sales potential therein through all channels or outlets available to soft drinks, using any and all equipment reasonably necessary to secure such distribution; must service all accounts with frequency adequate to keep them at all times fully supplied with the Beverages, except that the Distributor reserves the right to organize and schedule its own route books; must employ and train his own qualified personnel; must use his own personnel and trucks in numbers adequate for all seasons and must increase the number of his personnel and the number of his trucks whenever reasonably requested to do so by the Company to better assure Distributor's compliance with this agreement; and must fully cooperate in and vigorously push the Company's advertising and sales promotion programs and campaigns for the Territory;  (b)  the Company shall exercise diligence in maintaining supplies of Beverages to the Distributor.

4.    SALES OF COLLATERAL ITEMS

In order to increase sales of the Beverages, the Company has developed plans and programs for the placement of collateral items.   In accordance with the plans from time to time in effect, the Distributor will use his or its best efforts to secure placement in all outlets in the Territory bottle and can coolers of all types, bottle and can vending machines of all types, glasses, straws, advertising novelties and similar items supplied by the Company.  The Company will provide all such items to the Distributor on a non-discriminatory basis without reference to the identity of the Distributor.  Nothing herein contained, however, shall prevent the Company itself from placing such items at outlets in the Territory.

5.    ADVERTISING COOPERATION

The Distributor must fully cooperate in and vigorously promote the Company's advertising and sales promotion programs and campaigns for the Territory, and shall follow the Company's instructions in placing advertising material and carton racks and arranging floor displays.

6.   DISTRIBUTOR'S WAREHOUSE

Any Distributor who is not garaged or warehoused in a Company
plant or warehouse shall provide adequate and clean warehouse
space readily accessible to the Company and capable of
receiving deliveries of the Beverages and Beverage Syrup by
the Company in accordance with the customary delivery
practices of the Company with trucks and trailers of the size
and type customarily used by the Company.  Representatives of
the Company shall be allowed access to the Distributor's
warehouse during business hours to check on sanitary
conditions.

7.   DISTRIBUTOR'S TRUCKS

The Distributor shall at all times furnish and operate
sufficient delivery trucks to supply the Territory adequately
with the Beverages in all sizes and types of bottles and cans
and shall also comply with such additional requirements set
forth in Paragraph 3 of this agreement.  All such trucks used
by the Distributor in the distribution of the Company's
products, except trucks rented in the busy season on a
strictly temporary basis, shall be painted and inscribed in
compliance with the Company's requirements and shall be
maintained at all times in a clean and neat condition.  The
Distributor shall, at his or its expense, cause his or its
trucks to be painted with the basic white or other color
prescribed by the Company and with such inscriptions or
lettering as may be prescribed by the Company.  The Company
shall cause any inscription, lettering or change of color
prescribed by it to be painted or placed on the Distributor's
truck at the Company's own cost and expense.  The Company
shall have the right to designate and to redesignate from time
to time reasonable loading and unloading points for the
Distributor's trucks and other vehicles.

8.   UNIFORMS

The Distributor and all drivers and helpers who are employed
by him or it shall at all times when contacting customers or
delivering merchandise wear uniforms furnished by the
Distributor and approved by the Company.

9.   USE OF COMPANY TRADEMARK, SYMBOLS, ETC.

The Distributor will use the Company trademarks, symbols,
slogans and advertising material only upon such terms and
conditions as the Company may from time to time prescribe.
In the event that this agreement is terminated for any reason
whatsoever, the Distributor shall forthwith discontinue the
use of the trademark and all symbols, slogans and advertising
material of the Company and forthwith return to the Company
all advertising signs, novelties, coolers, glasses, straws and
other material in the possession of the Distributor on which

any such trademarks appear, it being understood that if the Distributor has paid the Company for any such material, the Company shall have the right to purchase the same from the Distributor by paying the cost price thereof to the Distributor.

10. **SALES RECORDS AND RIGHT OF INSPECTION**

The Distributor shall at all times maintain full and complete records and route books in a form approved by the Company and shall during ordinary business hours permit authorized representatives of the Company to inspect and make copies thereof. In order to assist the Distributor in marketing and advertising during advertising and promotional periods, the Company shall compile a list of all accounts being serviced by the Distributor from the route books, and the Distributor shall notify the Company every six months of any additions or deletions to that list of accounts.

11. **COMPANY PRICES AND PAYMENT**

Subject to the provisions of Paragraph 19 of this agreement, the Company shall provide the Distributor with sufficient quantities of all Beverages and Beverage Syrup to supply all accounts in the Territory as required in Paragraph 3. The Distributor shall deliver the Beverages and Beverage Syrup to accounts at the prices stipulated in the Schedule of Prices set forth in Exhibit "B", as from time to time amended in the manner hereinafter provided. As compensation therefore, the Distributor will receive the commissions specified in, or computed in accordance with, said Schedule of Prices set forth in Exhibit "B". The Distributor shall remit for all merchandise received from the Company, including, where applicable, bottles and cases, cash or Company-approved credits equal to the Company's stipulated prices. Approved credits shall consist of signed delivery tickets to Company-approved credit accounts plus commission statements setting forth commissions earned by the Distributor by type and size of Beverage and quality delivered.

12. **REVISION OF PRICES AND DEPOSIT REQUIREMENTS**

Any or all of the prices for the Beverages and Beverage Syrup stipulated in the aforesaid Schedule of Prices, as well as deposit requirements, may from time to time be revised to other or different prices or deposits by written notice by the Company to the Distributor. Any such notice shall stipulate the new prices or deposit requirements, and the new commission rate, as the case may be, and the effective date thereof, which shall be at least one day after the giving of such notice.

In the event of any increase or decrease in the stipulated price of package size, the commission payable to the Distributor for that package shall be increased or decreased,

as the case may be, by an amount equal to 15% of the stipulated price increase or decrease, all as provided in Exhibit "B".

13. **PACKAGE AND UNIT CHANGES**

The Company reserves the right to modify the size and/or type of bottles or containers used in packaging the Beverages, and the manner of packaging the Beverages, including the number of bottles or containers which shall constitute a unit of sale. In the event of modification as herein provided, the commission to be paid the Distributor shall be mutually agreed upon by the parties. Upon refusal or failure to enter into such agreement, the matter shall be subject to arbitration as provided in Paragraph 22 hereof -- Settlement of Disputes.

14. **BEVERAGES, BOTTLES AND CASES -- TITLE-RETURN**

Notwithstanding the remittance of cash or approved credits to the Company for any bottles or cases, all such bottles or cases collected from outlets shall remain solely the property of the Company and shall be disposed of solely in accordance with the Company's instructions. The Distributor shall not acquire title to or any interest in any Beverages, bottles or cases. The Company may, on a daily basis, inspect or take inventory of the Beverages in the Distributor's possession. The Distributor shall be responsible for any shrinkage in the Beverage or Beverage Syrup held by it for the Company. Payment for shrinkage shall be based upon the Company's stipulated prices less the commission allowance and shall be made daily. The Distributor shall at all times diligently cooperate with the Company to bring about the prompt collection of all empty returnable bottles and cases from outlets and to return such bottles and cases promptly to the Company, pre-sorted by the Distributor by sizes and by types of bottles.

15. **SPECIAL SALES PROMOTION**

In the event of a special Company promotion which includes "free" goods for outlets in the Distributor's Territory, the Company agrees to pay a sum equivalent to the Distributor's regular commission.

16. **TRANSFERS**

So long as this agreement is in effect, the Company shall accept any substitute agent produced by the Distributor to take over and service the Territory in place of the Distributor and shall approve the assignment of this agreement to enter into a new agreement for the balance of the term hereof in the form then in use by the Company, with such proposed party provided, he or it shall, to the satisfaction of the Company, meet the requirements of the Company as to

character, ability, financial responsibility, and adequacy of equipment to discharge the obligations assumed by the Distributor hereunder.   No approval of the transfer of the Territory shall be effective unless such approval, which approval shall not be unreasonably withheld, is in writing and is executed on behalf of the Company by an officer thereof. This agreement is a personal one on the part of the Distributor, and except as hereinabove provided, the agreement may not be assigned in whole or in part and none of the obligations herein provided to be performed by the Distributor may be delegated to any other person.   No sale or transfer of stock of Distributor shall be made without the written consent of the Company.   Upon the termination of this agreement, the mutual rights and obligations of the parties hereto shall cease and terminate and the Company shall be under no obligation to the Distributor and the Distributor shall have no right or interest in respect of the Territory or in any other respect whatsoever, except as herein expressly provided.

17.   COMPANY-DISTRIBUTOR RELATIONSHIP

The Distributor in his or its relation to the Company shall at all times be an independent agent and neither the Distributor nor any of his or its employees shall under any circumstances be deemed to be an employee of the Company. Neither the Distributor nor his or its employees shall make any representation in respect of the Company or its products not previously authorized by the Company in writing.   The Company shall use its best efforts to procure discontinuance of unauthorized sales of the Beverages in the Territory, but the Company shall not be liable to the Distributor with respect to any such unauthorized sales.

18.   DISTRIBUTOR'S COVENANTS

The Distributor shall not sell or distribute the Beverages or Beverage Syrup to outlets not included in the Territory unless specifically authorized so to do by the Company.   The Distributor shall not join in any slowdown or cessation of distribution of the Company's products, or directly or indirectly give aid or assistance in any such action.

19.   ALLOCATION OF PRODUCTS

In the event that the Company, by reason of any governmental regulations, strikes, fires, lack of materials, or any other reason whatsoever not limited to the foregoing enumeration other than its own willful fault, shall be unable to supply customers with the quantity of the Company's products which the respective customers shall require, the Company shall equitably allocate the available quantity of its products among the respective customers.

20. **TERMINATION BY THE COMPANY**

If the Company shall determine that the Distributor's failure or refusal to comply with one or more of the terms of this agreement, including without limitation, the failure to serve outlets in the Territory in the manner set forth in Paragraph 3 and other paragraphs of this agreement, is serious enough to warrant the action or if the Distributor is convicted of a felony, or if the Distributor becomes insolvent, makes an assignment for benefit of creditors, or if a trustee or receiver of the property or business of the Distributor is appointed, files or has filed against it a petition in Bankruptcy Act, suffers entry of any judgment against it which is not discharged, stayed or bonded of record within thirty (30) days, then, and in any such event, the Company may terminate this agreement by mailing to the Distributor by registered mail addressed to his or its last known address, a written notice terminating this agreement effective not less than thirty (30) days after the date of mailing the notice. Before issuing any such termination notice, as hereinabove provided in Paragraph 20, the Company shall give the Distributor reasonable opportunity to explain and excuse such failure or refusal.  The failure of the Company to exercise any right or to act in respect of any breach hereunder by the Distributor shall not constitute a waiver of such right or breach, as the case may be.  Nothing herein contained shall amount to a waiver of any right or remedy which the Company shall have at law or in equity in respect of any of the terms of this agreement or the performance of the Distributor hereunder.

21. **AGREEMENT COMPLETE - MODIFICATIONS**

It is expressly reaffirmed that, notwithstanding any contractual or non-contractual practices to the contrary under prior agreements, this agreement is intended to and shall supersede any and all existing agreements between the Company and the Distributor and expresses fully the agreement between the Company and the Distributor, and both parties agree that there are no promises, terms, conditions, understandings, commitments or obligations in respect of the subject matter of this agreement, except as set forth herein. This agreement shall not be modified except by written instrument executed by both of the parties.

22. **SETTLEMENT OF DISPUTES**

Any and all disputes between the parties, except for (a) the Distributor's obligations as provided for in the first two sentences of Paragraph 3, and (b) any matters covered by Paragraphs 20, 21, 23 and 24, shall be settled by the Vice President/Area Manager of PBG and the President of the Association.

Any and all disputes between the parties with regard to the first two sentences of Paragraph 3 and matters covered by Paragraphs 20, 21, 23 and 24 shall be settled by the President of PBG and the President of the Association.

In the event that these parties cannot agree, they shall appoint a third neutral arbitrator.

The decision of the majority of the arbitrators shall be final and binding upon the parties.

23. DISCONTINUANCE OF BEVERAGES - TERMINATION

Anything contained in this agreement to the contrary notwithstanding, the Distributor agrees that in the event the Company, for any reason whatsoever, discontinues the sale or distribution of any of the Beverages or Beverage Syrup in and about New York City during the term of this agreement, the Distributor's right to distribute any such product shall immediately cease and be deemed terminated, released and extinguished without any liability by either party to the other.

24. TERM OF AGREEMENT

This agreement expires on May 31, 1986 unless sooner terminated pursuant to the provisions hereof.

IN WITNESS WHEREOF, the Company and the Distributor have executed this Agreement the day and year below written.

Distributor:

Joseph M. DiStasi
Individual

Colonial Distributor
Corporation

Byx _____
President

Dated: 8/8/ , 1979

PEPSI-COLA BOTTLING GROUP

By _____
President

Business Address:
x 46-00 5th St
Long Island City, N.Y.

Home Address:
x _____

EXHIBIT B

PEPSI-COLA BOTTLING GROUP
NEW YORK CITY OPERATIONS

SCHEDULE OF PRICES AND COMMISSIONS
All Prices "Per Case"

| Pepsi Products | Distributor Commission | | | | Index Price to Retail Outlets as of June 1, 19 |
|---|---|---|---|---|---|
| | A | B | C | D | E |
| 7 N.R. | .8650 | .8950 | .9175 | .9400 | 4.50 |
| 10 N.R. | .9750 | 1.0050 | 1.0275 | 1.0500 | 5.70 |
| 16 N.R. | 1.0100 | 1.0400 | 1.0625 | 1.0850 | 6.25 |
| 32 N.R. | 1.0050 | 1.0350 | 1.0575 | 1.0800 | 6.00 |
| 48 N.R. | 1.0825 | 1.1125 | 1.1350 | 1.1575 | 6.00 |
| 2 Liter/64 oz. Pepsi Diet Light | 1.0400 | 1.0700 | 1.0925 | 1.1150 | 5.25 |
| 2 Liter/64 oz. Mt. Dew/Nu Grape | 1.0400 | 1.0700 | 1.0925 | 1.1150 | 4.80 |
| Cans | .9550 | .9850 | 1.0075 | 1.0300 | 5.75 |

| Schweppes Products | | | | | |
|---|---|---|---|---|---|
| 7 N.R. CN/BL | .8650 | .8950 | .9175 | .9400 | 4.75 |
| 10 N.R. CN/BL | .9750 | 1.0050 | 1.0275 | 1.0500 | 5.75 |
| 32 N.R. CN/BL | 1.0050 | 1.0350 | 1.0575 | 1.0800 | 6.65 |
| 7 N.R. CS/GA | .8800 | .9100 | .9325 | .9550 | 4.50 |
| 10 N.R. CS/GA | .9750 | 1.0050 | 1.0275 | 1.0500 | 4.80 |
| 32 N.R. CS/GA | .9500 | .9800 | 1.0025 | 1.0250 | 5.25 |
| Cans G/A | .9550 | .9850 | 1.0075 | 1.0300 | 5.75 |

For each product, the Distributor Commission per case shall be the greater of:

(1) the commission stated in Column A plus or minus 15% of any change in the index price to retail outlets per case stated in Column E; OR

(2) the amount shown in the following columns for the time period set forth thereafter:

B - from June 1, 1978 to May 31, 1979;
C - from June 1, 1979 to May 31, 1980;
D - from June 1, 1980 to May 31, 1981.

Returnable Products:  the returnable product commission shall be the same as the N.R. commission, less 2 cents per case. Furthermore, there shall be a commission of 2 cents per case of empties which is returned.

NOTE:- Territory Boundaries - Please note that your
Territory covers only the "near" side of the streets
bounding your Territory, unless otherwise specifically
noted.

Territory No. BX-6

Beginning at Southern Boulevard and East 183rd Street, north
on the west side of Southern Boulevard to the end of
Southern Boulevard at Webster Avenue, south on Webster
Avenue (including either side of Webster Avenue) to
East Fordham Road, east on the north side of East Fordham
Road to Washington Avenue, south on the east side of
Washington Avenue to East Tremont Avenue, east on the north
side of East Tremont Avenue to Arthur Avenue, north on the
west side of Arthur Avenue to East 183rd Street, east on the
north side of East 183rd Street to Southern Boulevard,
point of beginning.

12/4/84

Joseph V. Elisio 2/1/1989

J.V.E.

D.E.

NOTE:  Territory Boundaries - Please note that your
Territory covers only the "near" side of the streets
bounding your Territory, unless otherwise specifically
noted.

~~Dayton Distributing Corp.~~                    Territory No.  BX-7

Beginning at East 180th Street and Anthony Avenue, east on
the south side of East 180th Street to Washington Avenue,
south on the west side of Washington Avenue to East Tremont
Avenue, east on the south side of East Tremont Avenue to
Bathgate Avenue, south on the west side of Bathgate Avenue
to East 173rd Street, west on the north side of East 173rd
Street to Webster Avenue, south on the west side of Webster
Avenue to Clay Avenue, north on the east side of Clay Avenue
to East 173rd Street, west on the north side of East 173rd
Street to Topping Avenue, north on the east side of Topping
Avenue to East 176th Street, east on the south side of East
176th Street to Anthony Avenue, north on the east side of
Anthony Avenue to East 180th Street, the point of beginning.

## MEMORANDUM OF AGREEMENT

MEMORANDUM OF AGREEMENT entered into as of this 1st day of June, 1978 by and between PEPSI-COLA BOTTLING GROUP, hereinafter referred to as "PBG", a/k/a PEPSI-COLA METROPOLITAN BOTTLING COMPANY, INC., a New Jersey corporation, or its successors, and NEW YORK PEPSI-COLA DIS-TRIBUTORS ASSOCIATION, INC., hereinafter referred to as "the Association", or its successors, on its behalf and on behalf of each of its members.

This Memorandum of Agreement, hereinafter referred to as the "Agreement" shall be binding upon the parties hereto, their successors, administrators, executors and assigns.

PBG and certain members of the Association are signatories to a certain form of individual Distributor Agreement which, as amended, is to expire on May 31, 1978 and which agreement states the terms and conditions under which PBG will sell in New York City soft drink products manufactured by PBG, primarily Pepsi-Cola, through such individual members of the Association.

The Association declares that it has been and is authorized on behalf of each of the existing distributor signatories to negotiate an agreement with PBG.  Pursuant to and in accordance with that authority, the Association and PBG have negotiated with each other with regard to the preparation of a renewal Distributor Agreement to be executed by each of the distributors and to take effect as of June 1, 1978 and to remain in effect for a fixed term thereafter as hereinafter provided.

NOW, THEREFORE, in consideration of the foregoing and the agreement herein contained, the parties agree as follows:

FIRST. (a)  PBC currently owns several routes which it operates to its account.  In addition, PBC may from time to time as it sees fit and as it may lawfully do so acquire other routes, including routes acquired upon termination for cause as provided in the Distributor Agreement.  It is agreed that PBC may directly operate all of the routes which it owns with its own employees and supervision.  PBC agrees that it shall offer promotion programs within the City of New York on a nondiscriminatory basis without reference to route ownership.  Similarly, as to truck loading, vending service and vis-a-coolers, and any other service or equipment which PBC provides, such service and equipment shall be provided on a nondiscriminatory basis to all of the routes, irrespective of their ownership.  With regard to PBC's operations of the routes, PBC shall maintain route books which, as well as promotions and services provided such routes, shall, upon Association request, be subject to audit by the Association designees at the Association's expense.  In the event of such an audit, PBC shall, upon request, produce tickets, memoranda, books and records relating to the operations of such PBC operated routes.

(b)  Records of routes of individual owners shall, upon Association request in writing and upon the individual route owner's written authorization, be made available to a designee of the Association for examination provided that the request for such examination allows

- 2 -

sufficient time for the compilation of the records and provided further that such examination is carried out on PBG's premises at Association expense.

SECOND, the distributor agreement between PBG and each of the individual distributors shall be in the form hereinafter annexed as "Appendix A" and designated Distributor Agreement. The terms of the aforesaid Distributor Agreement shall upon acceptance and execution by an individual distributor continue in full force and effect as to such distributor until May 31, 1986 provided such acceptance and execution takes place before July 1, 1979. In the event that an individual distributor does not accept and execute such Distributor Agreement by July 1, 1979, his option to execute such an agreement shall terminate as of that date, and any and all distributor rights that he may have had as a distributor shall be determined in accordance with the agreement to which he is presently a signatory.

THIRD, it is agreed that syrup is to be included as one of the Pepsi products in Exhibit "B", the Schedule of Prices and Commissions, and the appropriate commission in existence as of June 1, 1978, as well as the appropriate pass throughs of increased commissions, to wit, 1 3/4 cents the first year, 1 1/2 cents the second year, and 1 1/2 cents the third year, are to be provided in the aforesaid schedule.

PEPSI-COLA BOTTLING GROUP

By _____
    Darrell Agee, President

By _____
    Richard M. Alven, Vice
    President - Sales
    Eastern Division

By _____
    Edward A. Haight, III
    Division Employee
    Relations Manager,
    Pepsi-Cola Company


NEW YORK PEPSI-COLA DISTRIBUTORS
ASSOCIATION, INC.

By _____
    Joseph DiStasi, President

By _____
    Michael Bevilacqua
    Vice President

By _____
    William Rose
    Secretary-Treasurer


       Each of the undersigned, having read in its entirety the foregoing Memorandum of Agreement between PBG and the Association dated June 1, 1978, does hereby subscribe thereto and agrees to be bound by each and every term therein for the full term of said Memorandum of Agreement.

SIGNATURE, INDIVIDUAL:    SIGNATURE, AS OFFICER OF
                        THE DISTRIBUTOR

- 4 -

AGREEMENT, made and entered into this 28th day of July, 1984, by and between NEW YORK PEPSI-COLA DISTRIBUTORS ASSOCIATION, INC., ("Association") on its behalf and on behalf of each of its members, and NEW YORK BEVERAGE ACQUISITION CORPORATION ("Company").

WHEREAS, PEPSI-COLA BOTTLING GROUP ("PBG") and each member of the Association ("Distributor") are signatories to a certain form of individual Distributor's Agreement ("Agreement"), which agreement (Exhibit A) states the terms and conditions under which PBG will sell in New York City soft drink products manufactured and distributed by PBG through each Distributor, and

WHEREAS, the Association declares that it has been and is authorized on behalf of each Distributor as listed on Schedule A to negotiate and execute this Agreement, and

WHEREAS, PBG is about to assign and transfer certain of its assets in and about New York City to Company, and

WHEREAS, "Agreement" is one of the assets to be assigned and transferred, and

WHEREAS, each Distributor is desirous of continuing to operate as the exclusive agent for delivery of the Beverages and Beverage Syrup to the outlets in the territory specified in its Agreement as modified herein, but for and on behalf of the Company.

EXHIBIT B

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

FIRST:  Company assumes the obligations of PBG as set forth in Agreement (as modified herein) but only on and after July 23, 1984, or at such other times as the acquisition from PBG is closed ("Closing Date") and then only as to post-closing date matters. It is specifically understood that Company assumes no obligation whatsoever for any matter or liability occurring or incurred prior to closing date, no matter when asserted.

SECOND:  Agreement is extended up to an including May 31, 2005.

THIRD:  Effective with the closing date, Distributor shall be paid a commission of $.05 per case (or such other amount as may be awarded in a pending arbitration proceeding involving distributors of the Coca Cola Bottling Company of New York, Inc.) for each case of empty non-refillable product actually returned by Distributor to Company, as mandated by the New York State Bottle Bill (Section 27-1001 et seq. E.C.L.).

FOURTH:  (a)  The term "Beverages" as used in the preamble to Agreement shall be deemed to include all carbonated and non-carbonated soft drinks, hereinafter, sold by Company in the New York City area.

(b)  The provisions of Paragraph 2 of Agreement shall be deemed enlarged so as to afford the maximum legal protection as to those products hereinafter handled by Distributors pursuant to the expanded definition of Beverage as set forth in this Paragraph Fourth.

(c)   The term Beverages shall also be deemed to include aseptic juices, but only those which Company because of parent company requirement or competitive factors delivers "store door".

(d)   The commission payable to Distributor for the store door delivery by it of any aseptic juices, shall be as mutually agreed upon by the parties, giving principal consideration to competitive factors.  In the event of a failure to so agree, the matter shall be subject to arbitration as provided in Paragraph 22 of Agreement.

FIFTH:   (a)  All references to Exhibit B in Paragraphs 11 and 12 of Agreement, as well as Exhibit B itself, are deemed deleted; it being understood that Distributor shall deliver the Beverages and Beverage Syrup to accounts at the prices stipulated by Company as from time to time amended in the manner provided in Agreement. As compensation therefore, Distributor shall receive its present rate of commissions, as modified herein and as subject to the provisions of Paragraph 12 of Agreement.

(b)   Distributor waives any rights it may have at any time to any further "labor pass through" (See litigation between PBG and Columbia-Oxford Beverages, Inc., for a definition of the term) and neither the right of Distributor to receive the same nor the amount of the same shall be an arbitrable issue under Agreement.

SIXTH:   (a)  The commissions payable to Distributor shall be reduced by the following amounts to the following new commissions, effective as of the closing date:

| Package | Wholesale Price | Commission Reduction | New Commission |
|---|---|---|---|
| 7 Oz. Pepsi Packages | $7.35 | $.096 | $1.1965 |
| 10 Oz. Pepsi Packages | 7.95 | .049 | 1.2635 |
| 16 Oz. Pepsi Packages | 9.25 | .08 | 1.38 |
| 1 Liter Pepsi Packages | 9.50 | .076 | 1.454 |
| Cans Pepsi Packages | 7.98 | .045 | 1.2445 |
| 2 Liter Pepsi Packages* | 8.08 | .105 | 1.3595 |

*  With respect to the 2 Liter Package, Company has announced that the stipulated price of the package shall forthwith be reduced to $7.60 per case and it is agreed that the commission shall further be reduced by 3.6 cents on January 1, 1985.

| Package | Wholesale Price | Commission Reduction | New Commission |
|---|---|---|---|
| 7 Oz. Schweppes Pkgs. | $7.00 | $.048 | $1.0975 |
| 10 Oz. Schweppes G/A and C/S | 7.70 | .112 | 1.298 |
| 10 Oz. Schweppes Tonic | 8.00 | .041 | 1.2715 |
| 1 Liter Schweppes G/A and C/S | 8.55 | .062 | 1.383 |
| 1 Liter Schweppes Tonic | 9.50 | No Reduction | 1.4325 |
| 1 Liter Schweppes Seltzer | 7.58 | No Reduction | 1.2995 |
| 2 Liter Schweppes Package | 8.08 | .14 | 1.395 |
| Cans Schweppes Packages | 7.65 | .045 | 1.195 |

(b)  Thereafter and notwithstanding the provisions of Paragraph 12 of Agreement, Distributor shall receive 10% as opposed to 15% of any increase in the stipulated price of a package (except for an increase in the stipulated price of the 2 Liter Pepsi package from $7.60 up to $8.08, in which event Distributor shall receive a commission increase equal in amount to the commission decrease theretofore received as a result of the stipulated price decrease from $8.08 down to $7.60) until such time as the commission for such package is no more than $.02 above the contractual markup which would be paid to a distributor

of the Coca Cola Bottling Company of New York, Inc., under its
present Distributors Agreement for an identical package at the
same suggested wholesale price in New York City.  At no time,
however, shall te difference between the 15% and the 10% be
allowed to result in a reduction fo the commission increase in
any June 1 to May 31 period, in excess of $.05 for such package.
In no event shall there be less than 1-1/2 cent decrease in
commissions or less than a 1-1/2 cent reduction in the commission
increase for the 2 Liter Packageīn the following periods but in
no event beyond such time as the commission for such package is
no more that $.02 above such comparable contractual markup for a
distributor of The Coca Cola Bottling Company of New York, Inc.:

```
          June 1, 1986   -   May 31, 1987
          June 1, 1987   -   May 31, 1988
          June 1, 1988   -   May 31, 1989
```

      The commission for any package which on June 1, 1989,
is still more the $.02 above the contractual markup which would
at that time be paid to a distributor of the Coca Cola Bottling
Company of New York, Inc., under its present distributors
agreement for an identical package at the same suggested
wholesale price in New York City, shall be reduced on June 1,
1989 to a commission equal to the said markup plus $.02.

      For the purposes of this sub-paragraph, Pepsi Cola and
other franchised package commissions shall be compared to Coca
Cola and franchised package commissions, while Schweppes package
commissions shall be compared to Seagrams package commissions.

      (c)  Anything herein or in Paragraphs 11 and 12 of
Agreement to the contrary notwithstanding, at no time (except as

hereinafter provided) shall the commissions payable to Distributor
be less than the following:

| | |
|---|---|
| 7 Oz. Pepsi Packages | $1.12 |
| 10 Oz. Pepsi Packages | 1.234 |
| 16 Oz. Pepsi Packages | 1.32 |
| 1 Liter Pepsi Packages | 1.397 |
| Cans Pepsi Packages | 1.219 |
| 2 Liter Pepsi Packages | 1.202 |
| 7 Oz. Schweppes Packages | 1.0245 |
| 10 Oz. Schweppes G/A and C/S | 1.205 |
| 10 Oz. Schweppes Tonic | 1.2055 |
| 1 Liter Schweppes G/A and C/S | 1.1985 |
| 1 Liter Schweppes Tonic | 1.197 |
| 1 Liter Schweppes Seltzer | 1.02 |
| 2 Liter Schweppes Packages | 1.202 |
| 2 Liter Schweppes Seltzer | 1.02 |
| Cans Schweppes Packages | 1.17 |

Notwithstanding the provisions of this sub-paragraph,
the commissions for any package which on any or all of the below
dates is more than $.02 above the contractual markup which would
at that time be paid to a distributor of The Coca Cola Bottling
Company of New York, Inc., under its then Distributor's Agreement
for an identical package at the same suggested wholesale price,
shall on such date or dates be reduced to a commission equal to the
said markup plus $.02:

> June 1, 1994
> June 1, 1999
> June 1, 2004

SEVENTH:   Association shall be given the right of first
refusal on all aseptic package trucking out of any manufacturing
plant of Company to any warehouses in New York City, provided
Association shall have obtained all necessary licenses, permits,
approvals, etc., shall have the necessary manpower and equipment
to adequately perform the trucking, shall match both the lowest
price and best terms received from any other party and shall be

able to render the services to reasonable satisfaction of Company. Reasonable advance notice shall be given to Association of any such trucking opportunity, commencing with such time and only so long as Association furnishes written documentation that it has obtained the necessary licenses, permits, approvals, etc. Absent reasonably timed advance written acceptance of any such opportunity, Association shall be deemed to have rejected such trucking opportunity. If the Association shall successively reject of be deemed to have rejected five (5) such opportunities, the provisions of this Paragraph shall be deemed cancelled and of no further force and effect.

EIGHTH:  Paragraph 22 of the Agreement is amended to read as follows:

"Any and all disputes or disagreements between the Company and the Distributor concerning the interpretation of application of the provisions of this Agreement, shall be determined in arbitration before Mr. William J. Glinsman, and judgment upon the award rendered by the said Arbitrator may be entered in any Court having jurisdiction.  In the event of the failure of Mr. Glinsman to act as Arbitrator for whatever reason, the person then acting as Arbitrator under the then collective bargaining agreement between the Company and the Soft Drink Workers Union, Local 812 I.B.T., shall act as his replacement until such time as the parties hereto shall designate in writing a substitute Arbitrator for Mr. Glinsman.  In no event shall the Arbitrator have the power to alter or amend the terms of this Agreement."

NINTH:  It is a condition of this Agreement that Company close its transaction with PBG, and failing such closing this Agreement shall be deemed immediately cancelled and of no force and effect (unless such condition shall be waived in writing by Company.)

IN WITNESS WHEREOF, the parties have hereunto caused this Agreement to be signed by their duly authorized officers the day and year first above written.

NEW YORK PEPSI-COLA DISTRIBUTORS ASSOCIATION, INC.

BY:_____
    Joseph DiStasi, President

BY:_____
    Michael Bevilacqua, Vice-Pres

BY:_____
    William Rose, Secy-Pres.

NEW YORK BEVERAGE ACQUISITION CORPORATION

BY:_____
    Dennis Berberich, Vice-Pres.

AGREEMENT made and entered into this 5th day of May, 1989, by and between NEW YORK PEPSI-COLA DISTRIBUTORS ASSOCIATION, INC. ("Association") on its behalf and on behalf of each of its members and PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC. ("Company").

WHEREAS Company and each member of Association are signatories to a certain form of individual Distributor's Agreement ("Agreement") which Agreement states the terms and conditions under which Company will sell, in New York City, Soft Drinks and Beverage Syrup manufactured by Company and distributed by Company through each Distributor; and

WHEREAS Association warrants that each Distributor listed on Schedule A hereof is a member of Association and Association has been authorized by each such Distributor to negotiate and execute this Agreement; and

WHEREAS the parties hereto have negotiated for and have reached an understanding with respect to the distribution by each Distributor of Beverage Syrup on and after May 8, 1989.

NOW THEREFORE, it is agreed as follows:

FIRST: As soon as is reasonably practicable on and after May 8, 1989, Company shall commence the distribution of Beverage Syrup within its franchised territory pursuant to the Syrup Appointments issued by PepsiCo Inc. as such Appointments may exist from time to time; it being the intention of this Agreement that Company shall ultimately assume complete distribution of Beverage Syrup within its franchised territory (subject to the provisions of paragraph FIFTH hereof). At such time as Company has commenced

such distribution within the territory of a Distributor, such Distributor shall immediately cease the distribution of Beverage Syrup. Commencing with May 8, 1989 and until such time as Company has commenced such distribution within the territory of a Distributor, the Distributor shall continue to distribute Beverage Syrup as heretofore, except that the commission to be paid by Company to the Distributor for each gallon of Beverage Syrup so delivered shall be:

> National Accounts - $.45 per gallon
>
> Local Accounts   - $.50 per gallon

At such time as Company shall commence the distribution of Beverage Syrup within the Distributor's territory, Company shall pay to the Distributor a commission of $.06 per gallon for each gallon of Beverage Syrup so delivered by Company in the territory of the Distributor,* whether to a National or a Local Account. Said commission is to be paid quarterly (with monthly accountings); payment is to be made on January 31, April 30, July 31 and October 31 for gallons delivered during the preceding three (3) months ending December 31, March 31, June 30 and September 30 respectively (but for no period prior to May 8, 1989). Company at the time of making such commission payment to the Distributor, shall provide the Distributor with a written statement showing the computation of such commissions and make available for inspection by the Distributor, at reasonable business hours, the records of Company upon which such computation is based.


*(Whether to Fountain Outlet or to Warehouses, even if intended
  retail sale)

The Distributors Agreement between Company and each Distributor is hereby deemed modified so as to incorporate the provisions of this Article FIRST, and all provisions in the said Distributor's Agreement granting the Distributor the right to deliver Beverage Syrup and providing for a commission therefore, are deemed revoked and of no further force and effect.

SECOND: Association agrees to procure the written consent of each and every Distributor to the terms of this Agreement; said consent to be evidenced by the Distributor affixing his signature to Schedule A hereto.

THIRD: In consideration of the reduction of the commissions as set forth herein for the remaining deliveries of Beverage Syrup by the Distributor, Company, within ten (10) days after the written consent of each and every Distributor shall have been procured (Article SECOND hereof), shall pay to Association, as agent for the Distributors, the sum of Five Hundred Thousand ($500,000) Dollars. Company assumes no responsibility for the allocation amongst the Distributors or the distribution to the said Distributors of the said sum; it being intended that such allocation and distribution be determined solely by Association and the Distributors as they, in their sole discretion, shall determine.

FOURTH: Except as specifically set forth in Article FIRST hereof, the terms and conditions of each Distributor's Agreement, shall continue unchanged and in full force and effect.

FIFTH:  In the event Beverage Syrup is at any time in the future delivered by Company "store door" to outlets for resale at retail, the same shall be delivered by the Distributors at such mark-up as the parties hereto shall mutually agree upon and failing such agreement, as determined in arbitration pursuant to the arbitration clause in each Distributor's Agreement.

SIXTH:  It is understood and agreed that the $.06 per gallon commission agreed to herein shall not be subject to reduction.

SEVENTH:  This agreement shall be binding upon the parties hereto as well as their successors and assigns.

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first above written.

NEW YORK PEPSI COLA DISTRIBUTORS ASSOCIATION, INC.

BY:_____

PEPSI COLA BOTTLING COMPANY OF NEW YORK, INC.

BY:_____

## ADDENDUM

**The following paragraph eighth is hereby added to the attached agreement.**

**EIGHTH:  In the event the Company elects to transfer its Beverage Syrup distribution rights to third person other than the Pepsi Cola Company, PepsiCo, other parent company, or any other Pepsi Cola Bottler to whom the Company's entire operation is transferred, the Association shall be given the right of first refusal on such transfer on such terms and conditions as are proposed in good faith to be given to the Association of such proposed transfer and the Association shall have thirty (30) days thereafter to exercise its right of first refusal, by certified mail, return receipt requested.**

                              **NEW YORK PEPSI COLA DISTRIBUTORS
                              ASSOCIATION, INC.**

                              **BY:_____**


                              **PEPSI COLA BOTTLING COMPANY OF NEW
                              YORK, INC.**

                              **BY:_____**