```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
BROOK BEVERAGE, INC.,                                   :
                                                        :
                              Plaintiff,                :
                                                        :           20-CV-9275 (VSB)
            - against -                                 :
                                                        :           **OPINION & ORDER**
                                                        :
PEPSI-COLA BOTTLING COMPANY OF                          :
NEW YORK, INC.,                                         :
                                                        :
                              Defendant.                :
                                                        :
------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/16/2021

Appearances:

Steve Cohn
Jeffrey Howard Weinberger
Law Office of Steven Cohn
Carle Place, NY

*Counsel for Plaintiff*

Patrick G. Brady
Epstein Becker & Green, P.C.
Newark, NJ

*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

Plaintiff Brook Beverage, Inc. ("Brook Beverage" or "Plaintiff") brings this action against Defendant Pepsi-Cola Bottling Company of New York, Inc. ("Pepsi-Cola" or "Defendant") for a declaratory judgment and permanent injunction. Before me are: 1) Plaintiff's motion for a preliminary injunction, (Doc. 10); 2) Plaintiff's motion to remand this case to state court, (Doc. 7); and 3) Defendant's motion to compel arbitration, (Doc. 15). For the reasons below, and as I held in my oral ruling in this case on February 5, 2021, Plaintiff's motion

for a preliminary injunction is GRANTED and Plaintiff's motion to remand is DENIED.  My decision on Defendant's motion to compel arbitration is held in abeyance to allow the parties to submit further materials.

## I.     Factual Background[1]

Plaintiff is a New York corporation founded by the late Joseph Eliseo with offices either in Oceanside, New York or the Bronx, New York.  (Doc. 1 ¶ 5; Doc. 1-1 ¶ 2.)  Defendant is a bottling and distribution company incorporated in Pennsylvania and whose principal place of business is in New Jersey.  (Doc. 1 ¶ 6.)  Defendant has facilities in New York City, and is registered to do business in New York State.  (*Id.*)  Since the parties entered into a distribution agreement in 1968, Plaintiff has been a licensed distributor of Defendant's soft-drink products.  (Doc. 1-1 ¶ 4.)  This distribution agreement has been modified several times over the years; the parties agree that the operative agreement (the "Agreement") is the one signed on February 2, 1999.  (*See* Doc. 21-1.)  The Agreement is between Pepsi-Cola Bottling Company of New York, Inc., "and Joseph V. Eliseo, an individual, Brook Beverage Inc., a New York corporation ('Distributor')."  (*Id*. at 2.)  Section 16 of the Agreement reads, in relevant part:

> So long as this agreement is in effect, the Company shall accept any substitute agent produced by the Distributor to take over and service the Territory in place of the Distributor and shall approve the assignment of this agreement to enter into a new agreement for the balance of the term hereof in the form then in use by the Company, with such proposed party provided, he or it shall, to the satisfaction of the Company, meet the requirements of the Company as to character, ability, financial responsibility, and adequacy of equipment to discharge the obligations assumed by the Distributor hereunder.  No approval of the transfer of the Territory shall be effective unless such approval, which approval shall not be unreasonably withheld, is in writing and is executed on behalf of the Company by an officer thereof.  This agreement is a personal one on the part of the Distributor, and except as hereinabove provided, the agreement may not be assigned in whole or in part and none of the obligations herein provided to be performed by the

---

[1] The facts set forth in this section are based primarily upon the various submissions by the parties filed in connection with the motions before me, including declarations and exhibits, and representations by counsel at the various conferences in this case.

> Distributor may be delegated to any other person.  No sale or transfer of stock of Distributor shall be made without the written consent of the Company.

(*Id.* at 8–9.)  Section 20 of the Agreement specifies Defendant's ability to terminate the Agreement if Defendant determines that Plaintiff "fail[ed] or refus[ed] to comply with one or more terms of this agreement."  (*Id.* at 10.)  The Agreement also contains the following arbitration clause:

> Any and all disputes or disagreements between the Company and the Distributor concerning the interpretation of application of the provisions of this Agreement, shall be determined in arbitration before Mr. William J. Glinsman . . . In the event of the failure of Mr. Glinsman to act as Arbitrator for whatever reason, the person then acting as Arbitrator under the then collective bargaining agreement between the Company and the Soft Drink Workers Union . . . shall act as his replacement until such time as the parties hereto shall designate in writing a substitute Arbitrator for Mr. Glinsman.

(*Id.* at 25.)

Prior to the filing of the instant action, on May 31, 2019, Defendant issued a notice of termination to Plaintiff and Joseph Eliseo for reasons different than those raised in the instant action.  (Doc. 16-6.)  On June 28, 2019, the Honorable Jerome C. Murphy, Justice, New York Supreme Court, Nassau County, granted a TRO enjoining Defendant from "terminating the Agreement and/or the Distributorship."  (*Id.*)  The parties agree that this TRO remains in effect today, while they disagree about its scope.

Joseph Eliseo died on July 10, 2020.  (Doc. 13-1 ¶ 6.)  When he died, Joseph Eliseo owned 90% of Brook Beverage's shares, while his son Vincent Eliseo owned the remaining 10%.  (*Id.*)  In the wake of Joseph Eliseo's death, Defendant sent Plaintiff two letters—one dated August 14, 2020, and the other dated September 8, 2020—asking Plaintiff about the ownership status of Joseph Eliseo's shares and reminding Plaintiff that the Agreement mandates that Defendant approve any sale or transfer of those shares.  (*Id.* at 11; Doc. 19, at 10.)  Plaintiff did not respond to either letter.  (*Id.*)  On or around October 5, 2020, counsel for Plaintiff informed

3

Defendant that Vincent Eliseo would be the executor of Joseph Eliseo's estate—a piece of information that Plaintiff's counsel later learned was incorrect, (*see* Doc. 30, at 32:1-10)—but that he did not have any other information. (Doc. 19, at 10.) On October 6, 2020, Defendant sent Plaintiff a "Notice of Proposed Termination of Distributor Agreement," in which Defendant stated that it would terminate the Agreement if Plaintiff did not produce a qualified transferee for Joseph Eliseo's shares by November 5, 2020. (Doc. 13-1, at 11–12.) The letter indicated that Plaintiff was noncompliant with Section 16 of the Agreement by failing to provide any information regarding the shares for months. (*Id.*)

      The parties appeared before me for an order to show cause hearing on Plaintiff's application for a temporary restraining order ("TRO") on November 18, 2020, (*see* Doc. 14), at which Plaintiff made clear that Joseph Eliseo's estate had not yet been settled through probate, such that the shares could neither be transferred nor sold at that time, (*see* Doc. 30, at 19:1-21:25.) At that point, the parties agreed, essentially, to preserve the status quo: Plaintiff agreed to not attempt to transfer any outstanding shares until the issuance of Letters Testamentary, while Defendant agreed not to act on its notice of termination. (Docs. 23, 41.) This armistice lasted a little over two months. However, at a status conference on January 27, 2021, Plaintiff represented that Joseph Eliseo's daughter had preserved an objection to the will, which threatened to further delay the issuance of Letters Testamentary—a court process that was already delayed and had not begun due to a COVID-19-related backlog at the Surrogate's Court. (Doc. 51, at 2:19-3:24.) At this point, Defendant indicated that it intended to take over the distribution route on February 8, 2021, at least until Joseph Eliseo's will was probated and the shares were sold. (*Id.* at 4:7-5:6.) Defendant made clear that during this time, Defendant would incur the costs and assume the revenues from the operation of the route. (*Id.* at 5:7-24.) As

4

grounds for this action, Defendant again claimed that Plaintiff violated Section 16 of the distribution agreement, this time arguing that "Joseph Eliseo's death has resulted in a *de facto* appointment of an individual who is running Brook Beverage without any formal transfer or sale" of Joseph Eliseo's shares.  (Doc. 49, at 4.)

## II.     Procedural History

On November 2, 2020, Plaintiff filed a complaint in New York State Supreme Court, seeking a declaratory judgment and permanent injunction barring Defendant from terminating the distribution agreement.  (Doc. 1-1.)  The case was removed to federal court on November 5, 2020, on grounds of diversity jurisdiction.  (Doc. 1.)

There are three motions and related sets of briefing in this litigation to date:  1) Plaintiff's motion for a TRO, which, for reasons explained *infra*, I am treating as a motion for a preliminary injunction; 2) Plaintiff's motion to remand to state court; and 3) Defendant's motion to compel arbitration.  On November 12, 2020, Plaintiff filed a proposed order to show cause seeking a TRO, along with a supporting memorandum of law, declarations, and exhibits.  (Docs. 10–13.)  Also on November 12, 2020, Plaintiff filed a motion to remand to state court, with an accompanying memorandum of law, declaration, and exhibits.  (Docs. 7–9.)  On November 17, 2020, Defendant filed an opposition to Plaintiff's TRO application and a motion to compel arbitration and stay or dismiss this action, supported by a memorandum of law and several declarations and exhibits.  (Docs. 15–21.)  Defendant submitted its opposition to Plaintiff's motion to remand on November 30, 2020, with a supporting declaration and exhibits.  (Docs. 27–28.)  Plaintiff filed its opposition to Defendant's motion to compel arbitration on December 8, 2020, with an accompanying declaration and exhibits.  (Docs. 35–36.)  Defendant filed its reply memorandum of law in support of its motion to compel arbitration on December 15, 2020,

5

with an accompanying declaration and exhibit. (Docs. 38–39.) On December 18, 2020, Plaintiff filed its reply memorandum of law in support of its motion to remand, along with a declaration and two exhibits. (Docs. 43–44.)

On January 27, 2021, I ordered the parties to each submit a letter describing 1) the harm, if any, to Defendant in maintaining the status quo (e.g., not taking over the route from Plaintiff on February 8, 2021); 2) the harm, if any, to Plaintiff in the event that Defendant ran the distribution route until the estate process is complete; 3) the provisions of the distribution agreement that each party was relying on in its arguments; and 4) whether or not I had jurisdiction to grant relief at all. (Doc. 48.) I also directed Defendant to address what Pepsi-Cola had done in comparable situations in the past. (*Id.*) The parties filed their submissions on February 3, 2021. (Docs. 49–50.)

On February 5, 2021, the parties appeared for a telephonic hearing. (*See* Doc. 48.) At the conclusion of the arguments by the parties, I made an oral ruling granting Plaintiff's motion for a preliminary injunction, denying Plaintiff's motion to remand, and holding in abeyance Defendant's motion to compel. This Opinion and Order provides additional bases for those oral rulings.

### III.    Legal Standard

"To successfully seek a preliminary injunction, a moving party must show four elements: (1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief." *JBR, Inc. v. Keurig Green Mt., Inc.*, 618 Fed. Appx. 31, 33 (2d Cir. 2015). "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Sterling v. Deutsche*

*Bank Nat'l Trust Co. as Trs. for Femit Trust 2006-FF6*, 368 F. Supp. 3d 723, 727 (S.D.N.Y. 2019) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted)).

### IV. Discussion

#### A. *Motion for Preliminary Injunction*

As a preliminary matter, although Plaintiff moved for a TRO, Defendant had both notice of the TRO and multiple opportunities to be heard. "Since both sides had the opportunity to be heard," I will "treat[] the motion for a temporary restraining order as a motion for a preliminary injunction." *Savoie v. Merchants Bank*, 84 F.3d 52, 54 (2d Cir. 1996); *see also Schiavone Constr. Co. v. N.Y.C. Transit Auth.*, 593 F. Supp. 1257, 1261 n.10 (S.D.N.Y. 1984) ("In view of the notice and opportunity to be heard which were afforded to the parties in this action, we consider it appropriate to analyze plaintiffs' application for a temporary restraining order under the standards governing the granting of preliminary injunctive relief."). While the legal standard for evaluating TROs and preliminary injunctions are identical, a preliminary injunction, unlike a TRO, does not require renewal after 14 days. *See* Fed. R. Civ. P. 65(b)(2).

The Second Circuit has held that, for purposes of a preliminary injunction motion, "[a]n evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case . . . or when the disputed facts are amenable to complete resolution on a paper record." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (internal citations omitted); *see also Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988) (noting that oral testimony was not required on a motion for a preliminary injunction where the "most significant factors" would have "remained essentially unchanged by any additional evidence"). To the extent that the February 5, 2021 conference in

7

this case did not qualify as a full evidentiary hearing on Plaintiff's motion for a preliminary injunction, I find that such a hearing was not required because complete resolution of the motion before me is possible on the extensive paper record—including declarations—submitted by the parties.

Accordingly, I will now evaluate the preliminary injunction factors as they relate to Plaintiff's motion.

### 1. Likelihood of Success on the Merits

During this litigation, Defendant made two separate arguments for why Plaintiff violated Section 16 of the Agreement, such that termination was authorized under Section 20 of the Agreement. In its October 6, 2020 termination letter and its November 17, 2020 opposition to Plaintiff's TRO motion, Defendant argued that Plaintiff was violating Section 16 because it failed to respond to Defendant's multiple letters asking for information about the ownership status of Joseph Eliseo's shares and Plaintiff could not "proceed indefinitely without complying with" Section 16. (Doc. 19, at 16–17.) This proceeding itself essentially remedied this first argument. Counsel for Plaintiff and Defendant have been in contact since mid-November 2020, and Plaintiff's counsel has provided Defendant with updates about the status of the shares and Joseph Eliseo's estate through meet-and-confers and at status conferences in this case, including providing the name of the attorney involved in the probate process. When Defendant represented on January 27, 2021 that it intended to take over the route on February 8, 2021, it was fully informed that Joseph Eliseo's will had been submitted for probate with his daughter preserving her potential objection(s), and that the process was not yet complete and that Letters Testamentary had not yet been issued. Defendant's counsel was also aware—and in fact argued on many occasions—that no one yet had the legal authority to transfer or sell Joseph Eliseo's

8

outstanding shares. As such, assuming that failure to provide timely information about Joseph Eliseo's shares could potentially violate Section 16, Plaintiff's disclosures—the transparency of which Defendant has not challenged—since mid-November 2020 demonstrate that no such violation occurred here.

Having received updates from Plaintiff regarding Joseph Eliseo's shares and estate, Defendant now makes a second argument: Plaintiff has violated Section 16 of the Agreement because Brook Beverage's decision to continue operating the route at the direction of Vincent Eliseo during the pendency of Joseph Eliseo's estate constitutes a de facto assignment of the Agreement without Defendant's consent. (*See* Doc. 49, at 4–5.) Defendant argues that it "contracted for Joseph Eliseo's personal services under the Agreement," and that Plaintiff operating the route when Defendant has not approved any sale or transfer amounts to Plaintiff "rewrit[ing] the Distributor Agreement." (*Id.* at 2, 4.)

Defendant's argument is wrong and fails for several reasons. First, Brook Beverage itself was a party to the Agreement, in addition to Defendant and Joseph Eliseo. (Doc. 21-1, at 2.) Defendant itself acknowledges this, noting in a declaration that the operative Agreement is between "Plaintiff, Joseph Eliseo (collectively, "Distributor") and [Defendant]." (Doc. 21 ¶ 9.) Defendant's own admission belies its argument that "there is no Distributor," (Doc. 49, at 2)—Brook Beverage is undoubtedly a distributor and party to the agreement. Indeed, the plain text of the Agreement itself makes clear not only that Brook Beverage is a distributor, but also that Joseph Eliseo might not be a distributor. Although Defendant describes Joseph Eliseo and Brook Beverage as collectively being known as "Distributor," (Doc. 21 ¶ 9), the Agreement states it is between Pepsi-Cola "and Joseph V. Eliseo, an individual, Brook Beverage Inc., a New York corporation ('Distributor')," (Doc. 21-1, at 2.) Further, the Agreement imposes few, if any,

9

affirmative duties on Joseph Eliseo himself; virtually all the provisions in the Agreement bind the "Distributor," which the Agreement defines as Brook Beverage.  At minimum, any reasonable interpretation of this Agreement must find that Brook Beverage is both a party and a distributor.

Second, even if that were not true, Section 16 does not give Defendant the authority to terminate the Agreement under the circumstances presented here.  Section 16 requires Plaintiff to obtain Defendant's written consent to transfer any shares.  (Doc. 21-1, at 8–9.)  However, Section 16 neither contemplates what happens when a distributor dies nor requires that any shares be transferred within a certain period of time.  (*See id.*)  By asking that I read in a provision requiring Plaintiff to assign the shares within a specified period of time, or declare that the Agreement is void upon the death of Joseph Eliseo, Defendant "is undertaking to rewrite the contract."  *Chock Full O'Nuts Corp. v. Tetley, Inc.*, 152 F.3d 202, 205 (2d Cir. 1998); *see also generally Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) ("The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement.").  This is particularly unwarranted where, as here, both parties acknowledge that the shares cannot currently be legally transferred or sold.

Third, Defendant's argument necessarily implies—as Defendant's counsel confirmed at the February 5, 2021 conference in this case—that Plaintiff had breached the Agreement immediately upon Joseph Eliseo's death.  Under Defendant's reading, Plaintiff was authorized to operate the route only while Joseph Eliseo was still alive and holding his shares, thus meaning that Plaintiff—which has operated the route since Joseph Eliseo's death on July 10, 2020—has been in violation of the Agreement for about seven months.  Defendant did not make this

argument until January 27, 2021—despite having the opportunity to do so in multiple demand letters to Plaintiff, multiple conferences in this case, and in its opposition to Plaintiff's motion for preliminary relief.  The reason for this is simple:  the Agreement simply cannot be logically read as being breached by the death of Joseph Eliseo.  There is nothing in the Agreement that suggests that the Agreement becomes void whenever Joseph Eliseo is no longer President of Brook Beverage, or that Brook Beverage can only operate the route if Joseph Eliseo serves as President of the company.  In addition, Defendant's argument that Plaintiff violated the Agreement by operating the route in an identical fashion as it had done previously—and during which time Plaintiff has generated revenue for Defendant and distributed Defendant's product—is precisely the sort of absurd outcome courts must avoid when interpreting contracts.  *See Spanski Enters. V. Telewizja Polska S.A.*, 832 Fed. App'x 723, 726 (2d Cir. 2020) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.") (internal quotation marks omitted).  It is telling that Defendant is unable to point to a single other instance in which the company has insisted on operating the route upon the death of a distributor.  (*See* Doc. 49, at 6.)

       Fourth, Defendant is incorrect when it classifies the Agreement as a "contract[] for Joseph Eliseo's personal services." (Doc. 49, at 4.)  Contracts for personal services are defined as "one[s] where the duty thereunder is so unique that the duty is thereby rendered nondelegable." *In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986).  As a preliminary matter, Section 16 states that the "agreement is a personal one on the part of the *Distributor*." (Doc. 21-1, at 9) (emphasis added).  As noted *supra*, the Agreement refers to Brook Beverage as the "Distributor," not Joseph Eliseo.  (*Id.* at 2.)  Further, an agreement must contract for an obligor's "unique and extraordinary skills" in order to qualify as

11

a personal services contract. *Steinbeck v. Steinbeck Heritage Found.*, 400 Fed. Appx. 572, 579 (2d Cir. 2010); *see also id.* ("where unique and extraordinary services of a particular obligor are the subject of a contract, that obligor's death absolves the parties of any unfulfilled performance obligations"); *Rogers v. HSN Direct Joint Venture*, No. 97 Civ. 7710(LLS), 1998 WL 566804, at *2 (S.D.N.Y. Sept. 4, 1998) ("Since under the Talent Agreement plaintiff provided services of a unique nature based on her statute as a beauty expert and consultant to celebrities, the Talent Agreement is a contract for personal services. It is thus (contrary to the general rule) not assignable"); *In re Compass*, 65 B.R. at 1011 (finding that a contract must concern an obligor's "special knowledge, unique skill or talent, singular judgment and taste" to qualify as a personal services contract). As noted *supra*, the Agreement imposes few, if any, duties on Joseph Eliseo himself, and makes no reference to any "unique and extraordinary services" that Joseph Eliseo might possess as an obligor. In other words, the Agreement is not a contract for Joseph Eliseo's personal services.

Defendant insists that it is not terminating the Agreement by temporarily taking over the route until the issuance of Letters Testamentary, because Plaintiff will still be able to sell the route and the Agreement will be in place once the will is probated. I do not agree. As explained *infra*, Plaintiff will lose a significant amount of revenue, and potentially its entire business, if Defendant takes over the route for the foreseeable future. Nevertheless, the question about whether or not Defendant is terminating the Agreement is ultimately irrelevant. Either Defendant is terminating the Agreement, which I have determined is likely unlawful; or Defendant is unlawfully breaching the Agreement by temporarily taking over the route and withholding revenue from Plaintiff, a maneuver that is not permitted under the Agreement. For this latter scenario, Defendant argues that, because it has the right to terminate the Agreement

12

pursuant to Sections 16 and 20, it also has "the power to take over [the] route in anticipation of termination." (Doc. 49, at 5.) Defendant cites no case law or contractual provisions for this claim. In any event, as noted above, this argument is moot by my finding that Plaintiff has not violated the Agreement.

For these reasons, I find that Plaintiff is likely to succeed on the merits of its claim.[2]

### 2. Irreparable Harm

"[A]n irreparable injury is an injury that is not remote or speculative but actual and imminent, [] for which a monetary award cannot be adequate compensation," *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (internal quotation marks omitted), and which cannot be remedied "if a court waits until the end of trial to resolve the harm," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

I find that Plaintiff has satisfied its burden to prove that it will likely suffer irreparable injury if Defendant were to take over the route. When a company is "forced to lay off personnel," that constitutes "independent evidence of irreparable harm." *Sanofi-Synthelabo v. Apotex, Inc.*, 388 F. Supp. 2d 317, 342 (S.D.N.Y. 2006). Here, Plaintiff represents that, because it will no longer receive revenue from the route, it would "mean an immediate suspension of Brook Beverage's three employees." (Doc. 50, at 4.) Further, courts have found that the "loss of

---

[2] I note that the language of the 2019 TRO issued in state court, which remains in effect today, likely independently prevents Defendant's actions here. (*See* Doc. 16-6.) Defendant argues that this is not the case for two reasons. First, Defendant argues that the TRO does not apply because it was issued in a separate proceeding involving entirely different factual circumstances and where the parties are not identical to the ones here. Those all seem like distinctions without a difference. The TRO plainly prevents Defendant from "terminating the Agreement and/or the Distributorship," without language limiting the TRO to that particular proceeding or the particular factual circumstances Defendant alleged in its May 31, 2019 termination letter. (*Id.*) Second, even if the TRO applies, Defendant has already argued that it is not terminating the Agreement because it intends to turn the route back over to Plaintiff for sale after the estate process concludes. However, as noted *supra*, I found that Plaintiff is likely to succeed on its claim that Defendant's threat to take over the route temporarily is effectively terminating the Agreement. In any event, I do not make a finding on whether or not the 2019 TRO would be violated by the conduct at issue in this case, because it is not entirely appropriate for me, as a federal judge, to interpret and rule on the scope of a TRO issued in state court as a matter of first impression.

reputation and customer goodwill," as Plaintiff credibly argues, (*id.*), also establishes irreparable harm. *See, e.g.*, *Really Good Stuff, LLC v. BAP Inv'rs, L.C.*, 813 Fed. App'x 39, 44 (2d Cir. 2010) ("The loss of reputation and goodwill constitutes irreparable harm."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (finding irreparable harm "through loss of reputation, good will, and business opportunities"); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68–69 (2d Cir. 1999) (finding irreparable harm because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."). It seems highly likely that, if the probate process takes months or years, Plaintiff will lose its professional relationships with its customers and its standing in the beverage distribution community. Finally, the serious injuries Plaintiff faces—loss of its employees, business vehicles, customer relationships, and position in the market—means that "the very viability of the plaintiff's business" is threatened, which itself constitutes irreparable harm. *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *see also Soap Opera Now, Inc. v. News America Pub. Inc.*, No. 90 CIV. 2631 (RJW), 1990 WL 124335, at *4 (S.D.N.Y. Aug. 17, 1990) ("Cases in this Circuit and elsewhere establish that the loss of a business constitutes irreparable injury sufficient to satisfy the preliminary injunction standard.").

     Defendant argues that Plaintiff will suffer little harm from the attempted takeover, because the value of the route will stay the same or increase, Defendant will return the route after the will is probated, and Plaintiff's customers will not receive any meaningful change in service. (Doc. 49, at 3–4.) In other words, Defendant argues that it is the distribution route that is the business. However, this argument ignores the fact that if Defendant takes over the route—even for a relatively brief period of time—Plaintiff is likely to lose its employees, business vehicles,

14

customer relationships, and position in the marketplace.  Given that Defendant threatens to take over the route on February 8, 2021, this threatened injury is surely actual and imminent.  Thus, Plaintiff has established it is likely to suffer irreparable harm absent this preliminary injunction.

### 3. Balance of Hardships

At the February 5, 2021 status conference in this case, Defendant conceded that it has no information that there have been any problems with the distributorship since Joseph Eliseo's passing.  Instead, Defendant argued—as it did in its February 3, 2021 letter—that its harm is that "there is no Brook Beverage Distributor who [Defendant] may hold personally accountable under the Distributor Agreement for compliance."  (Doc. 49, at 2.)  As noted *supra*, Brook Beverage is a party to, and classified as a "Distributor" under, the Agreement, such that the company is in fact accountable under the Agreement.  Regardless, the injury that Defendant describes is, at best, "non-imminent and largely speculative," *Great Earth Int'l Franchising Corp. v. Milks Devs., Inc.*, 302 F. Supp. 2d 248, 255 (S.D.N.Y. 2004), and therefore it cannot possibly match the imminent, irreparable harm Plaintiff faces, *see Emons Industries, Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289, 1298–99 (S.D.N.Y. 1990) (finding that the balance of hardships is tilted "considerably" in favor of movants that have established imminent harm as compared to non-movants alleging "wholly speculative" injuries").

### 4. Public Interest

There is no indication that issuing a preliminary injunction in this case would harm the public interest.  If anything, the public interest weighs in favor of ensuring that Defendant does not terminate or breach the valid Agreement.  *See General Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181 (KMK), 2020 WL 915824, at *12 (S.D.N.Y. Feb. 26, 2020) ("Courts routinely hold there is undoubtedly a public interest in enforcing valid contracts") (internal

15

quotation marks omitted).

Consequently, I find that Plaintiff has met its burden meriting the issuance of a preliminary injunction to prevent Defendant from taking over the distribution route. As I will now explain, I will make a subsequent decision concerning the precise scope of that injunction.

### B. *Motion to Compel Arbitration*

The parties disagree about whether or not the Agreement's arbitration clause, (*see* Doc. 21-1, at 25), governs this dispute, (*see* Docs. 19, 35, 38.) Even where an arbitration clause properly applies to a dispute, courts may still issue a preliminary injunction to preserve the status quo pending the outcome of arbitration. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 238 (2d Cir. 2016) ("Generally, 'courts should consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration.'") (quoting *American Express Fin. Advisors v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998)). Therefore, my decision on the motion for arbitration will affect the scope of the preliminary injunction I ultimately order—namely, whether or not the injunction will lapse following a decision from an arbitrator or after further proceedings before me.

At the February 5, 2021 conference in this case, I directed the parties to submit any additional materials necessary to the motion to compel arbitration, and to meet and confer beforehand to ensure that the submissions are comprehensive but not repetitive. I will hold my decision on the motion to compel arbitration in abeyance until I receive and review these materials. The injunction will remain in place in the near term, no matter what.

### C. *Motion to Remand*

Finally, Plaintiff argues that even though I have subject matter jurisdiction to hear this case, discretionary remand is appropriate either pursuant to 28 U.S.C. § 1447(e) or under the

Declaratory Judgment Act, so that this case may be consolidated with the pending state action in which Plaintiff already obtained a TRO. (*See* Doc. 7.) Section 1447(e) reads:

> If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

Plaintiff concedes that the factual situation envisioned by § 1447(e) does not apply here; Plaintiff is not seeking to join additional defendants whose joinder would destroy subject matter jurisdiction. (*See* Doc. 8, at 8.) However, Plaintiff cites a handful of cases that have applied § 1447(e) in a similar context to this litigation, where federal courts have remanded to state court to consolidate with pending state court actions "[i]n the interest of avoiding multiple and duplicative litigation." *Mensah v. World Truck Corp.*, 210 F. Supp. 320, 322 (S.D.N.Y. 2002).

> The Declaratory Judgment Act reads, in relevant part:
>
> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). As such, "the Declaratory Judgment Act vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action." (Doc. 8, at 12) (quoting *Soros Management LLC v. TradeWinds Holdings, Inc.*, No. 17 Civ. 3187 (JFK), 2018 WL 1276879, at *2 (S.D.N.Y. Mar. 12, 2018)).

The parties acknowledge that I have jurisdiction to hear this dispute and that, under either legal standard, any remand would be discretionary. As such, I decline to exercise my discretion to remand. This case has been in front of me for months, during which time I have reviewed three rounds of briefing, held several status conferences with the parties, and have been updated regularly as to relevant factual developments. It is my understanding that, while there is a state action currently pending, the parties have not appeared in state court related to the instant dispute

17

and do not intend to formally seek clarity from the state court regarding whether the 2019 TRO applies to this dispute. In the meantime, Plaintiff seeks immediate relief from an action by Defendant that Plaintiff credibly argues would cause it imminent harm, and on which the state court is not well positioned to act quickly. Accordingly, remanding at this juncture would only add uncertainty and inefficiency to the process of adjudicating the instant dispute.

### V. Conclusion

Accordingly, it is hereby:

ORDERED that Plaintiff's motion for a preliminary injunction is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion to remand is DENIED.

IT IS FURTHER ORDERED that Defendant's motion to compel arbitration is held in abeyance. The parties are directed to submit any necessary materials related to Defendant's motion to compel arbitration on or before February 12, 2021, and to meet and confer beforehand to ensure that the submissions are comprehensive but not repetitive. Upon receiving and reviewing these materials, I will enter a separate decision on Defendant's motion to compel that will clarify the scope of the preliminary injunction ordered here.

The Clerk's office is directed to close the open motion at Document 7.

SO ORDERED.

Dated: February 16, 2021
     New York, New York

Vernon S. Broderick
United States District Judge